1

2

3

4           UNITED STATES DISTRICT COURT

5          NORTHERN DISTRICT OF CALIFORNIA

6

7    RAYMOND J. MANZANILLO,                    Case No. 12-cv-05983-JST

                     Plaintiff,
8
                                               **ORDER DENYING DEFENDANTS'**
9          v.                                  **MOTIONS FOR SUMMARY**
                                               **JUDGMENT**
10   GREGORY D. LEWIS, et al.,
                                               Re: ECF Nos. 204, 206
             Defendants.
11

12

13         Plaintiff Raymond Manzanillo, an inmate at Pelican Bay Prison, was stabbed by another

14   inmate when a guard left his cell door open.  Manzanillo alleges that the guard knew that an attack

15   was likely and that he left the door open in retaliation for Manzanillo having filed a prior lawsuit

16   concerning the prison.

17         Defendants now move for summary judgment, arguing that (1) Defendant Brown, the

18   guard who left Manzanillo's door open, was not deliberately indifferent to the risk to Manzanillo's

19   safety; (2) the training Brown received was adequate, and that even if it was not, the remaining

20   defendants were unaware of any deficiencies in that training; and (3) in any event, all defendants

21   are entitled to qualified immunity.  ECF No. 204, 206.

22         For the reasons set forth below, the Court will deny the motions.

23   **I.     FACTUAL AND PROCEDURAL BACKGROUND**[1]

24         **A.     Manzanillo's Prior Lawsuit**

25         During the events giving rise to this lawsuit, Manzanillo was incarcerated at Pelican Bay

26   State Prison within the California Department of Corrections and Rehabilitation ("CDCR").

27   _____

28   [1] As it must, the Court views the facts in the light most favorable to Manzanillo.  Tolan v. Cotton,
     134 S. Ct. 1861, 1866 (2014).

United States District Court
Northern District of California

1   Manzanillo was housed in the Security Housing Unit (SHU).[2]  Inmates housed in the SHU have

2   severe disciplinary issues, convictions for assaults committed in prison, or are validated gang

3   members and associates.  ECF No. 212-1 ("Lewis Depo.") at 6-8; ECF No. 212-2 ("McGuyer

4   Depo.") at 3-4; ECF No. 212-8 ("Brown Depo.") at 12; Vasquez Decl. ¶ 15.

5          On August 10, 2010, Brown filed a civil rights action for excessive force against prison

6   officials pursuant to 42 U.S.C. § 1983.  ECF No. 13 at 5; see also ECF No. 213 ¶ 10 ("Manzanillo

7   Decl.").  That action was pending when the events underlying this case occurred.  ECF No. 13 at

8   5.  In his complaint, Manzanillo alleges that Pelican Bay staff permitted him to be assaulted by

9   another inmate in retaliation for filing this lawsuit.  See, e.g., ECF No. 13 at 2 (stating that

10  Defendants "collaborat[ed] in a staging of a gladiator fight that resulted in Plaintiff being attacked

11  and stabbed by another prisoner to retaliate against me for exercising protected conduct").  The

12  presence or absence of such a motive by the guards is not at issue in the present motion.

13         **B.     The Events of August 8, 2011**

14         The events underlying the present case took place on August 8, 2011.  Some time before

15  10:35 a.m. that day, Defendant Naeem Brown, acting as the Control Booth Officer in

16  Manzanillo's pod of cells, let inmate George Blakeley out into the exercise yard.  ECF No. 212-8

17  ("Brown Depo.") at 12.  Blakeley was a member of the "Northern Structure Prison Gang," a

18  "Norteño" affiliated gang, while Manzanillo was an associate of the "Mexican Mafia," or

19  "Sureños" affiliated gang.  Manzanillo Decl. ¶ 13.  "It is common prison knowledge . . . that rival

20  gang inmates in PBSP must be kept separate due to the rioting that occurs in the general

21  population between Northern Hispanics and Southern Hispanics."  Id. at ¶ 15.  At approximately

22  10:35 a.m., while Blakeley was still in the yard, Brown released Manzanillo from his cell so he

23  could speak to a law library officer at the front door of the pod about documents related to his

24  excessive force lawsuit.  Brown Depo. at 12; Manzanillo Decl. ¶¶ 10-12.  While Manzanillo was

25  speaking to the law library officer, Brown allowed Correctional Sergeant B. Grenert, his superior,

26  into the control booth and began speaking to him.  Brown Depo. at 12.  Inmate Blakeley, from the

27

28  _____
    [2] Manzanillo is now an inmate at Kern Valley State Prison.  Manzanillo Decl. ¶ 2.

United States District Court
Northern District of California

yard, was watching "off and on" what was going on inside the pod.  Brown Depo. at 14; see also

ECF No. 204-1 at 6. While Brown and Grenert were still speaking, Manzanillo and the law library

officer finished their conversation.  Brown Depo. at 12.  Brown saw that Manzanillo turned away

from the pod door and made eye contact with him as he was returning to his cell, but admits that

he did not maintain constant visual observation of Manzanillo until he was back in his cell with

the door secured, a violation of his post orders.  Brown Depo. at 15; Manzanillo Decl. ¶¶ 21-23.  It

is undisputed that Manzanillo's "cell door was not electronically secured by control booth officer

defendant Brown."  ECF No. 13 at 7.

It seems that while Brown was still conversing with Sergeant Grenert, Blakeley asked to

re-enter the pod to return to his cell.[3]  Brown Depo. at 13.  Brown looked into the pod to make

sure that no inmates were outside of their cells.  Id.  Brown claims that he then "looked up at the

[sic] inmate Manzanillo," but that because Manzanillo's cell "was kind of – it was on the upper

tier and it's in the corner," Brown "guess[es] [he] just didn't really notice that his door was open."

Id.  When Brown moved to allow Blakeley inside, Manzanillo alleges that he heard the "unit floor

officer L. Simonsen state to Brown . . . 'No I don't want you [to].'"  Manzanillo Decl. ¶ 22.

"A couple of seconds later Brown open[ed] the exercise door allowing [Blakeley] out of

the yard."  ECF No. 13 at 7; Brown Depo. at 13.  Given what happened next, a reasonable jury

could conclude that Blakeley was aware, when he entered the pod, that Manzanillo's door was not

closed.  Manzanillo Decl. ¶ 26.  Also, since inmates in the exercise yard "can hear when [cell

doors] open and close because it's pretty loud," they are aware when a cell opens and closes and if

a cell door is open or closed.  Brown Depo. at 14.  Instead of returning to his own cell, Blakeley

"threw something into his cell" and then immediately "ran up the stairs and entered [Manzanillo's]

cell to attack [him]" with a homemade 7-inch knife.  Manzanillo Decl. ¶¶ 23-25.  Brown agrees

that when he let Blakeley in, he could immediately tell by his actions "something was wrong

because he came and he ran straight in and he ran up the stairs."  Brown Depo. at 14.  Brown then

"looked up," saw "that the cell door was open," and saw "where [Blakeley] was going."  Id.

_____

[3]There are some slight differences in Brown's various retellings of the events, discussed in further
detail below.  See infra at 13.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Once Blakeley ran inside, Manzanillo "never heard Brown yell out any command for

2    Blakeley to stop his course of action and/or return to his cell," and he never heard Blakeley's cell

3    door being opened as it normally would be upon an inmate's return from the yard.  Manzanillo

4    Decl. ¶ 24.  Brown did not attempt to lock Manzanillo's door before Blakeley arrived there.  Id. ¶

5    25.  Instead, when he realized what was happening, he hit his alarm button and made a radio call

6    for backup.  Brown Depo. at 14.  Manzanillo estimates that "cell doors which were only opened

7    half way took less than [three] seconds or so to close," and that it took Blakeley "almost [eight]

8    seconds to trot up the stairs and enter" Manzanillo's cell.  Manzanillo Decl. ¶ 27.[4]  Once Blakeley

9    entered Manzanillo's cell, Brown closed the door to it, locking both inmates inside.  Id.

10   Manzanillo tried to defend himself for several minutes "before Pelican Bay officials finally

11   entered the unit" and pepper sprayed both Manzanillo and the other prisoner to end the assault.  Id.

12   Afterwards, Manzanillo was escorted to be decontaminated from the pepper spray.  He

13   alleges that during the escort Defendants Wood and Hallock told him they "had no choice."

14   Manzanillo Decl. ¶ 30.  Manzanillo was treated for stab wounds and lacerations, and the

15   institution Investigative Services Unit took photographs of his injuries.  ECF No. 13 at 8.  Brown's

16   actions were administratively reviewed and he was disciplined.  See ECF No. 208, Ex. D at 34;

17   McGuyer Depo. at 20; Lewis Depo. at 30, 38; Brown Depo. at 56; Lewis Depo. at 25-26.

18   On November 26, 2012, Manzanillo filed this case.  ECF No. 1.  The First Amended

19   Complaint was filed on April 26, 2013, alleging, under § 1983, violations of his First Amendment

20

21   [4]Defendant Brown makes a variety of objections to Manzanillo's declaration.  ECF No. 224 at 2-5.
22   For the most part, the objections do not specifically identify the allegedly objectionable testimony.
     See, e.g., id. at 2 (stating that "plaintiff cites to hearsay on multiple occasions in his opposition to
23   the motion" without providing a paragraph number).  The Court can only overrule these
     objections.  Defendant Brown does make a specific hearsay objection on page 3, lines 4-6, and a
24   foundation objection at page 5, lines 2-4.  Both of these objections are also overruled.

25   The remaining Defendants also make certain objections, ECF No. 225 at 11-12, which do cite to
     the particular portions of Manzanillo's declaration to which Defendants object.  All of those
26   objections are overruled, except for the speculation objection to Paragraph 21 of Manzanillo's
     declaration, which is sustained.  The Court notes, however, that Defendant Brown acknowledged
27   in his deposition that there was a light in the control booth that lit up when a cell door was open,
     so this fact is still in the record.  Brown Depo. at 35-36.  With regard to Defendants' hearsay
28   objections, the Court notes that all of the statements in question have been offered for the fact they
     were said, and not for the truth of the matter asserted.

1   right to be free from retaliation for seeking redress of grievances,[5] his Eighth Amendment right to

2   be free from torture and deliberate indifference to his safety, and his Fourteenth Amendment right

3   to equal protection by Defendants Greg D. Lewis, Kurt McGuyer, Troy A. Wood, John Hallock,

4   and Naeem Brown.  ECF No. 13 at 2, 4.

5           **C.     Jurisdiction**

6           The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.

7   **II.   DISCUSSION**

8           **A.     Legal Standard**

9           Summary judgment is proper where the pleadings, discovery and affidavits show there is

10  "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

11  law."  See Fed. R. Civ. P. 56(a) (2014).  Material facts are those that may affect the outcome of the

12  case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material

13  fact is genuine if the evidence is such that a reasonable jury could return a verdict for the

14  nonmoving party.  See id.

15          A court shall grant summary judgment "against a party who fails to make a showing

16  sufficient to establish the existence of an element essential to that party's case, and on which that

17  party will bear the burden of proof at trial[,] . . . since a complete failure of proof concerning an

18  essential element of the nonmoving party's case necessarily renders all other facts immaterial."

19  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The moving party bears the initial

20

21  [5]While Manzanillo's complaint alleges a First Amendment retaliation claim, all parties' briefing
    regarding the Defendants' motions for summary judgment is limited to Manzanillo's Eighth
22  Amendment deliberate indifference claim.  See ECF No. 13 at 2.  The Court likewise limits its
    analysis to that claim.  Manzanillo's claim of retaliation is relevant on this motion only to
23  Defendants' potential state of mind and motive concerning Plaintiff's deliberate indifference
    claims.  See Fed. R. Evid. 803(3).
24

25     On July 27, 2011, Manzanillo attended an annual review meeting and informed Defendant Lewis
    that he had filed an administrative grievance.  ECF No. 13 at ¶ 4. After he "attempted to seek [a]
26  preliminary injunction against Defendant Lewis in the pending lawsuit . . . [Manzanillo alleges]
    Pelican Bay officials retaliated against [Manzanillo] and tortured [him]."  Id. ¶¶ 5-6.  Manzanillo
27  alleges that he was "harassed and threatened verbally, guards spit on his food, [he] was under
    constant surveillance . . . and [he] was tortured by Pelican Bay officials utilizing radio frequency."
28  Id. ¶¶ 3, 6, 7.  Defendants do not engage with these allegations in their motions for summary
    judgment, and Manzanillo makes no claim directly based on them.

United States District Court
Northern District of California

1    burden of identifying those portions of the record that demonstrate the absence of a genuine issue

2    of material fact.  Id.  The burden then shifts to the nonmoving party to "go beyond the pleadings

3    and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on

4    file,' designate 'specific facts showing that there is a genuine issue for trial.'"  See id. at 324

5    (citing Fed. R. Civ. P. 56(e)).

6           For purposes of summary judgment, the court must view the evidence in the light most

7    favorable to the nonmoving party; if the evidence produced by the moving party conflicts with

8    evidence produced by the nonmoving party, the court must assume the truth of the evidence

9    submitted by the nonmoving party.  See Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir.

10   1999).  The court's function on a summary judgment motion is not to make credibility

11   determinations or weigh conflicting evidence with respect to a disputed material fact.  See T.W.

12   Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

13          The non-moving party, however, must "identify with reasonable particularity the evidence

14   that precludes summary judgment."  Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996).  Indeed,

15   it is not the duty of the district court "to scour the record in search of a genuine issue of triable

16   fact."  Id.  "A mere scintilla of evidence will not be sufficient to defeat a properly supported

17   motion for summary judgment; rather, the nonmoving party must introduce some significant

18   probative evidence tending to support the complaint."  Summers v. Teichert & Son, Inc., 127 F.3d

19   1150, 1152 (9th Cir. 1997) (citation and internal quotation marks omitted).  If the non-moving

20   party fails to make this showing, the moving party is entitled to summary judgment.  Celotex, 477

21   U.S. at 323.

22          **B.      Eighth Amendment Safety Claims**[6]

23

24   _____

[6]"[S]tate officials sued in their official capacities are not 'persons' within the meaning of 1983,"
25   and damage claims against prison officials in their official capacities are barred by the Eleventh
     Amendment.  Will v. Michigan Dep't of State Police, 491 U.S. 58, 70 (1989); see also Doe v.
26   Lawrence Livermore Nat'l Lab., 131 F.3d 836, 839 (9th Cir. 1997).  Thus, any claims for money
     damages brought by Manzanillo against the defendants in their official capacities are barred.
27   Manzanillo's claims for injunctive and declaratory relief against defendants in their official
     capacities, however, may proceed.  See Ex Parte Young, 209 U.S. 123 (1908).
28

6

United States District Court
Northern District of California

1   It is well-established that prison officials have a duty to take reasonable steps to protect

2   inmates from physical harm.  See Farmer v. Brennan, 511 U.S. 825, 832-33 (1994).  In particular,

3   prison officials have an affirmative duty to protect inmates from violence at the hands of other

4   inmates.  See id. at 833.  The failure of a prison official to protect inmates from attacks by others

5   from dangerous conditions at the prison only violates the Eighth Amendment, however, when two

6   requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the

7   official is, subjectively, deliberately indifferent to the inmate's safety.  See id. at 834.

8   In determining whether a deprivation is sufficiently serious to satisfy the objective

9   component of an Eighth Amendment claim, a court must consider the circumstances, nature, and

10   duration of the deprivation.  Id.  With respect to the subjective component in prison conditions

11   cases, a prison official cannot be held liable under the Eighth Amendment for failing to guarantee

12   the safety of a prisoner unless the standard for criminal recklessness is met, i.e., the official must

13   know of and disregard an excessive risk to the inmate's safety.  See id. at 837 (holding deliberate

14   indifference requires that "the official knows of and disregards an excessive risk to inmate health

15   or safety; the official must both be aware of facts from which the inference could be drawn that a

16   substantial risk of serious harm exists, and he must also draw the inference").

17   Deliberate indifference lies "somewhere between the poles of negligence at one end and

18   purpose or knowledge at the other."  Id. at 836.  On the one hand, deliberate indifference describes

19   a more blameworthy state of mind than negligence – negligence, and even gross negligence, are

20   not enough to trigger an Eighth Amendment violation.  See id. at 835.  On the other hand, a

21   plaintiff is not required to show purposeful conduct to meet his burden of showing deliberate

22   indifference.  Id. at 836.

23   **1.      Defendant Naeem Brown**

24   Defendant Naeem Brown brings a separate summary judgment motion as to himself.  ECF

25   No. 204.  Manzanillo brings only one cause of action against him, alleging Brown was

26   deliberately indifferent to his safety by not securing Manzanillo's cell door and by allowing

27   Blakeley to enter and attack him.  ECF No. 13 at 9, 12.

28   **a.      Brown's Training and Knowledge of Safety Concerns**

United States District Court
Northern District of California

1        The first question relevant to Brown's motion is whether he was aware of the risk to

2   Manzanillo's safety posed by an open cell door, which in turn depends, in part, on his training.

3        As part of that training, Brown received basic instruction on the rules, regulations, policies,

4   and procedures of the California Department of Corrections and Rehabilitation ("CDCR").  Brown

5   Depo. at 4; ECF No. 208 Ex. E ("Hallock Depo.") at 12-14.  He was instructed on prison gangs

6   and rivalries, the risk-classification levels that CDCR assigns to inmates, and inmate-housing

7   settings, including the SHU.  Brown Depo. at 5-9.  After basic training, Brown received a 40-hour

8   block training, which was supposed to include training in how to operate the SHU control booth.

9   Lewis Depo. at 10; Brown Depo. at 16.  Prior to Brown's first shift in the SHU Unit D-8 control

10  booth, Brown reviewed, understood, and signed Post Order 292349, which describes an officer's

11  responsibilities while working in the control booth.  Lewis Depo. at 11-13; Brown Depo. at 25-29.

12  Those responsibilities include making a visual check of the pod before opening any door to ensure

13  there are no staff or inmates present, maintaining constant observation of an unescorted inmate

14  when releasing that inmate from his cell to attend various in-house activities, and ensuring that no

15  two doors are open at the same time.  Brown Depo. at 33-35.  Brown also confirmed that he

16  understood that before returning an inmate from the yard, operational procedures required him to

17  "visually inspect the pod and view the control panel to ensure all inmates are secured in their

18  cells."  Brown Depo. at 39.

19       Brown fully understood that failing to secure Manzanillo's cell door before allowing

20  Blakeley into the pod amounted to a violation of the prison's policies and procedures, as well as

21  his post orders.  Brown Depo. 25-27, 29, 53.  As certain Defendants acknowledge, "[i]t is

22  undisputed that the training instructed officers to constantly observe an inmate until that inmate

23  returns to his cell and the door is secured."  ECF No. 206 at 14.

24       Brown's on-the-job training, however, did not provide him with an opportunity to practice

25  operating the control booth control panel, and he did not observe inmate movement.  He stated

26  that "it just so happened when I went up there for my two hours . . . everyone was locked up.  So I

27  didn't get to see anything because . . . there was no movement."  Brown Depo. at 20.  Several of

28  the Defendants, as well as Manzanillo's expert, Daniel Vasquez, have testified that on-the-job

United States District Court
Northern District of California

1   training is not effective unless the trainee officer observes inmate movement and actually works

2   the control panel to operate the doors in the SHU.  See, e.g., Vasquez Decl. ¶¶ 18-19; ECF No.

3   208-2, Ex. B, McGuyer Depo. at 4-5.  For example, Defendant McGuyer opined "[i]f you weren't

4   observing inmate movement, then there wasn't a training going on.  You were sitting in a control

5   booth with somebody."  McGuyer Depo. at 4.  Observation of inmate movement is "required."  Id.

6   Defendant Wood concurred that if "Officer Brown was not shown any prisoner movement during

7   his training block," then "he would not be adequately trained."  ECF No. 209, Ex. A ("Wood

8   Depo. III") at 10.  And Vasquez testified that "For an officer preparing to take the post of Control

9   Booth Operator, training that does not require the officer to observe inmate movement and

10   actually use the control panel to operate the doors is inadequate."  Vasquez Decl. ¶ 18.

11   Before beginning to work in the control booth, Brown understood that the SHU only

12   housed "validated indeterminate gang members and associates."  ECF No. 218-1 at 17-18.[7]  And

13   he already knew, from his training at the CDCR academy, that "all gangs were rivals."  Id. at 4-5.

14   He also learned that rival gang members could attack each other if they interacted.  Id. at 8.  He

15   also learned, once he got to Pelican Bay, that the inmates housed in the SHU were "some of the

16   worst inmates at the institution and they needed to be segregated from everybody else."  Id. at 12.

17   The inmates in the SHU are dangerous, and Brown was aware of that danger on August 8, 2011.

18   Id. at 13.

19   Moreover, all Defendants were aware that violating operating procedures in the control

20   booth, such as opening cell doors inappropriately, accidentally, or in violation of the operational

21   procedures, often leads to inmate injuries and violence.  McGuyer Depo. at 8.  SHU operational

22   procedure 222 explains that "staff and inmates will not be in the same proximity with an

23   unrestrained inmate."  McGuyer Depo. at 19.  The operating rules intended to keep inmates

24   separated while unrestrained are clearly in place due to safety concerns.  Id.

### b.   Objective Component

26   A reasonable factfinder, viewing the facts in the light most favorable to Manzanillo, could

---

[7] ECF No. 218-1 contains additional portions of Brown's deposition.

United States District Court
Northern District of California

1   find that he was subjected to an objectively substantial risk of serious harm when his door

2   remained unsecured while another inmate – a member of a rival gang – was allowed into the pod

3   unescorted.

4         First, Manzanillo has presented evidence that there are clear policies in place regarding

5   inmate movement that are designed to avoid this precise risk.  See ECF No. 208, Ex. D, ("Wood

6   Depo. II") at 21-23; see also infra at 8.  Manzanillo points to a Post Order issued by the California

7   Department of Corrections and Rehabilitation (CDCR) regarding the duties of a Control Booth

8   Officer at PBSP.  It states, in relevant part: "Under no circumstances should two or more inmates

9   be allowed in the same area at the same time unless they are cellmates or unless both inmates are

10  under the control of staff and are in mechanical restraints."  ECF No. 208-6, Ex. G-2, at 18.  Post

11  Order 292349 also states that "[w]hen releasing an unescorted inmate from his cell to attend

12  various in-house activities (i.e. yard, shower or staff interviews at the pod door), you will maintain

13  constant observation of the inmate until he is restrained by staff or secured into a cell."  ECF No.

14  208-6, Ex. G-2, at 5.  Defendant Brown signed and indicated that he had read and understood

15  these orders before he began work in the control booth. Brown Depo. at 23.

16        Moreover, Manzanillo has established that the SHU houses inmates who "pose a definite

17  and serious threat to the safety of others or themselves."  Prison Op. Proc. 222, at 3. The Control

18  Booth Officer supervises and manages the movement of inmates and other correctional officers

19  within that portion of the SHU.  Post Order 292349; Op. Proc. 222, at 13-21. The Control Booth

20  Officer's primary responsibility is to keep inmates separated from others in order to prevent

21  violence.  Vasquez Decl. ¶ 15.

22        The evidence is undisputed that inmate-on-inmate violence occurs in the SHU, that

23  inadvertent or intentional door openings may lead to such violence, and that the policies described

24  above are in place to prevent violence.  See Wood Depo. II at 21-23; see also infra at 8.

25  Defendant Wood acknowledged in his deposition that, in the SHU, "due to the assaultive nature of

26  the inmates housed there . . . the different gang rivalries and the politics within the different prison

27  gangs when you let two inmates out unrestrained generally there was going to be a fight."  Wood

28  Depo. II at 21.  Defendant Hallock corroborated that "it is the obligation of the inmates . . . if an

United States District Court
Northern District of California

10

1    officer" opens a door to "fight," and "it happen[s] all the time." Hallock Depo. at 4-5. Brown's

2    basic training, as described above, provided him with knowledge of prison gangs and rivalries and

3    the violence that can occur.

4          The Court finds that Manzanillo has established a triable issue of fact as to whether

5    Brown's failure to close Manzanillo's door before allowing Blakely to enter the pod created "an

6    objectively substantial risk of harm." Brown v. Lynch, 831 F.3d 1146, 1150 (9th Cir. 2016).

7                    c.      **Subjective Component**

8          Viewing the evidence in the light most favorable to Manzanillo, the Court also concludes

9    that genuine disputes of material fact exist as to whether Brown knew of the substantial risk and

10   disregarded it.

11         "Whether a prison official had the requisite knowledge of a substantial risk is a question of

12   fact subject to demonstration in the usual ways, including inference from circumstantial

13   evidence . . ." Farmer, 511 U.S. at 842. "[A] factfinder may conclude that a prison official knew

14   of a substantial risk from the very fact that the risk was obvious." Id.; see also Berg v. Kincheloe,

15   794 F.2d 457, 459 (9th Cir. 1986) (holding that the prison official need not "believe to a moral

16   certainty that one inmate intends to attack another at a given place at a time certain before that

17   officer is obligated to take steps to prevent such an assault."). The "obviousness of a risk,"

18   however, is not conclusive, and "a prison official may demonstrate that the obvious escaped him."

19   Farmer, 511 U.S. at 843, n.8. "If a prison official should have been aware of the risk, but was not,

20   then the official has not violated the Eighth Amendment, no matter how severe the risk." Gibson

21   v. Cnty of Washoe, Nev., 290 F.3d 1175, 1188 (9th Cir. 2002).

22         Defendant Brown states that he had no prior knowledge of the affiliations of Manzanillo or

23   his attacker when the attack occurred, ECF No. 204-2 ("Brown Decl.") ¶ 4; that he did not know

24   that Manzanillo had instituted his prior lawsuit, id.; and that he failed to notice that Manzanillo's

25   door was open when he allowed Blakely back into the pod. ECF No. 204-1 at 6. Defendant

26   Brown therefore argues that he was not aware of any specific risk to Manzanillo's safety, and did

27   not disregard any such risk. Brown Decl. ¶¶ 6-7.

28         Viewing the facts in the light most favorable to Manzanillo, however, a reasonable jury

United States District Court
Northern District of California

11

United States District Court
Northern District of California

1    could conclude that Brown was deliberately indifferent to the risk of attack on Manzanillo.  Brown

2    concedes that he did not follow his post orders when he failed to visually observe Manzanillo all

3    the way into his cell.  See Brown Depo. at 83 ("I chose [speaking to a supervisor] over" following

4    procedures as they related to operating doors in the SHU).  Moreover, although Brown disclaims

5    knowing about Manzanillo's prior lawsuit, or realizing that Manzanillo's door was open,

6    Manzanillo has raised triable issues of fact regarding Brown's credibility.  Although Brown claims

7    not to know about Manzanillo's lawsuit, he knew that Manzanillo was talking to the law library

8    officer immediately before Blakely entered the pod.  Brown Depo. at 39.  A jury could find that

9    Brown was aware of the inmates' gang affiliations, which were "common knowledge" in the pod.

10   See Manzanillo Decl. ¶ 14 ("Based on my observations, the gang affiliations of inmates were

11   common knowledge in the Pod. . . . each inmate housed in my Pod was assigned an identification

12   card that indicated each inmate's race and/or gang affiliations.").  And several grounds would

13   permit a jury to disbelieve Brown's initial statement that he was not aware of Manzanillo's open

14   door when he let Blakely in: the contradiction between his initial statement that the open door was

15   difficult to see and his later statement that he noticed the open door when he saw Blakely running

16   into the pod; the undisputed evidence that a light inside the control booth showed when a door was

17   open; Manzanillo's testimony that more than enough time remained to close the door once

18   Blakeley entered the pod, but Brown chose not to do so; that another officer allegedly called out to

19   Brown not to open the door for Blakely in the first place; and that Brown has given different

20   accounts of the events.[8]  See ECF No. 214-1 at 9; Brown Depo. at 162-63; Vasquez Decl. at 19-

21   23; Manzanillo Decl. ¶¶ 21-23.  Taking this evidence in the light most favorable to Manzanillo, he

22   has sufficiently established genuine questions of material fact which must be answered by a jury.

23            Notably, the Ninth Circuit has reversed a grant of summary judgment in similar

24   circumstances.  In Delgado v. Barnes, 465 Fed. Appx. 712 (9th Cir. 2012), the defendant argued to

25

26   _____

27   [8]In Brown's incident report to CDCR, he stated that he went to the bathroom without realizing
     Manzanillo's door remained unsecured; in his responses to interrogatories, he stated he was
     "attempting to also secure plaintiff Manzanillo's cell door" while talking to Sergeant Grenert; and

28   at his Skelly hearing and in a deposition he made no mention of a trip to the bathroom or any
     attempt to secure Manzanillo's cell.  ECF No. 215 at 8-9.

1    the district court that his release of the prisoners who attacked the plaintiff was "inadvertent."

2    Delgado v. Barnes, No. C 08-2556 PJH (PR), 2010 WL 3744367, at *3 (N.D. Cal. Sep. 20, 2010).

3    The plaintiff argued that the defendant's "actions were done on purpose." Id.  The district court

4    held that "[p]laintiff's statements [went] only to his beliefs, not what [the defendant] believed or

5    what his intent was," and therefore plaintiff could not "generate a genuine issue of material fact as

6    to whether the release was inadvertent." Id. (citing Rodriguez v. Airborne Express, 265 F.3d 890,

7    902 (9th Cir. 2001)).  Since "the only fact that might generate a genuine issue as to [the

8    defendant's] intent, that he opened the inmates' cell doors at the wrong time, [was] equally

9    probative of intent or inadvertence," the district court granted summary judgment. Id.  The Ninth

10   Circuit reversed, noting that even in a sparse "he said, she said" situation, summary judgment is

11   "premature" where "a factfinder may conclude that a prison official knew of a substantial risk

12   from the very fact that the risk was obvious." Delgado, 465 Fed. Appx. at 712 (quoting Farmer,

13   511 U.S. at 842).

14          Accordingly, Defendant Brown is not entitled to summary judgment on Manzanillo's

15   Eighth Amendment claim.

### d.    Qualified Immunity

17          Defendant Brown also argues that summary judgment is warranted because he is entitled to

18   qualified immunity from Manzanillo's Eighth Amendment claim.  The defense of qualified

19   immunity protects "government officials . . . from liability for civil damages insofar as their

20   conduct does not violate clearly established statutory or constitutional rights of which a reasonable

21   person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  A court considering

22   a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of

23   an actual constitutional right and whether such right was "clearly established." Pearson v.

24   Callahan, 555 U.S. 223, 236 (2009).  Where there is no clearly established law that certain conduct

25   constitutes a constitutional violation, a defendant cannot be on notice that such conduct is

26   unlawful. Rodis v. County of San Francisco, 558 F.3d 964, 970–71 (9th Cir.2009).  The relevant,

27   dispositive inquiry in determining whether a right is clearly established is whether it would be

28   clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Saucier

United States District Court
Northern District of California

1   v. Katz, 533 U.S. 194, 202 (2001).

2          The Court has already determined that a jury could conclude that Defendant Brown's

3   actions violated the Eighth Amendment.  Therefore, the Court now considers whether the right at

4   issue was "clearly established" at the time of the violation.  In a § 1983 action, the plaintiff "bears

5   the burden of proving that the right allegedly violated was clearly established at the time of the

6   official's allegedly impermissible conduct."  Camarillo v. McCarthy, 998 F.2d 638, 640 (9th Cir.

7   1993).  To qualify as a clearly established constitutional right, a plaintiff must show "that every

8   reasonable official would [have understood] that what he is doing violates that right."  Reichle v.

9   Howards, 132 S.Ct. 2088, 2093 (2012) (citation and internal quotation marks omitted).  In other

10  words, "existing precedent must have placed the statutory or constitutional question beyond

11  debate."  Id. (citation and internal quotation marks omitted).

12          By August 2011, it was clearly established in the Ninth Circuit that prison officials violate

13  inmates' constitutional rights when the officials are aware "that placing inmates of different races

14  [or gangs] in [the same place] at the same time presents a serious risk of violent outbreaks," yet

15  allow them to be in the same place together anyway.  Robinson v. Prunty, 249 F.3d 862, 867 (9th

16  Cir. 2001).

17          Brown also contends that he is entitled to qualified immunity because he acted reasonably.

18  ECF No. 204 at 13-14.  Whether a prison official's actions were reasonable is a mixed question of

19  law and fact: "It involves an objective test of whether a reasonable official could have believed

20  that his conduct was lawful in light of what he knew and the action he took.  If there are genuine

21  issues of material fact in issue relating to the historical facts of what the official knew or what he

22  did, it is clear that these are questions of fact for the jury to determine."  Williams, 2012 WL

23  1094351, at *11 (quoting Sinaloa Lake Owners Ass'n v. City of Simi Valley, 70 F.3d 1095, 1099

24  (9th Cir. 1995)).

25          The Court also cannot grant qualified immunity on this ground.  Here, as in Williams,

26  "[w]hen the facts underlying Plaintiff's deliberate indifference to safety . . . claim[] [is] viewed in

27  the light most favorable to him, a genuine issue of material fact exists as to the reasonableness of

28  Defendant letting [Manzanillo] and [Blakeley] out . . . at the same time . . . in light of

United States District Court
Northern District of California

14

1    [Defendant's] knowledge that it was a violation of prison policy to do so and [Manzanillo] and

2    [Blakelely] were members of different gangs." Id.  A jury could conclude that no reasonable

3    officer knowing what Brown knew – that the SHU housed dangerous inmates who were not to be

4    in the same place at the same time, that prisoners of differing gangs were obligated to fight each

5    other if they could, and that policies in place required constant visual monitoring while they

6    moved about and securing of inmates once they arrived at their destination – would have

7    purposefully violated those policies by being aware of an open door, ignoring it to continue a

8    conversation, and then allowing a rival gang member into the pod, creating a substantial risk of

9    two inmates being together in the same place unrestrained.

10          In short, Brown's motion for summary judgment on grounds of qualified immunity is

11   denied.

**2.     Defendants Wood, McGuyer, Lewis, and Hallock**

**a.     Failure To Train**

14          Manzanillo also brings an Eighth Amendment deliberate indifference claim against

15   Defendants Wood, McGuyer, Lewis, and Hallock for their "tacit approval" of and failure-to-train

16   Defendant Brown.  See ECF No. 13.  Defendant Gregory Lewis was the warden of Pelican Bay

17   State Prison during the relevant period and "was responsible for the complete operation of the

18   institution," including hiring and personnel matters.  Lewis Depo. at 3.  Defendant Kurt McGuyer

19   was the associate warden and had administrative responsibility for the daily operations within the

20   SHU.  McGuyer Depo. at 5.  Defendant Troy Wood was the SHU Facility-D Captain for second

21   watch during the relevant period, and managed and oversaw the daily operations of SHU Facility-

22   D from 6:00 a.m. to 2:00 p.m.  Wood Depo. I at 4.  One of Defendant Wood's reported duties was

23   to "[e]nsure that appropriate training is administered to staff on a continuous basis."  Wood Depo.

24   II at 24.  Defendant John Hallock was the SHU Facility-D Sergeant for second watch during the

25   relevant period and supervised the daily operations of SHU Facility-D, maintaining supervision of

26   all staff assigned to that facility from 6:00 a.m. to 2:00 p.m.  Hallock Depo. 11-16.  It is

27   undisputed that Defendants Wood, McGuyer, Lewis, and Hallock all had responsibility for

28   Defendant Brown's training.

United States District Court
Northern District of California

15

1    The Ninth Circuit has "long permitted plaintiffs to hold supervisors individually liable in

2  § 1983 suits when culpable action, or inaction, is directly attributed to them." Starr v. Baca, 652

3  F.3d 1202, 1205 (9th Cir. 2011), cert. denied, 132 S.Ct. 2101 (2012).  A supervisor may be liable

4  under § 1983 upon a showing of (1) personal involvement in the constitutional deprivation or (2) a

5  sufficient causal connection between the supervisor's wrongful conduct and the constitutional

6  violation.  Redman v. Cnty. of San Diego, 942 F.2d 1435, 1446 (9th Cir. 1991) (en banc).

7    Supervisory liability may attach if the requisite causal connection is established "'by

8  setting in motion a series of acts by others,' [or] by 'knowingly refus[ing] to terminate a series of

9  acts by others, which [the supervisor] knew or reasonably should have known would cause others

10  to inflict a constitutional injury.'"  Starr, 652 F.3d at 1207-08 (quoting Dubner v. City & Cnty. of

11  San Francisco, 266 F.3d 959, 968 (9th Cir. 2001)).  Officials who are "ultimately in charge of the

12  facility's operations," who know or reasonably should have known about dangerous conditions

13  and acquiesce "'in a deficient policy that was a moving force behind' the harm caused to the

14  plaintiff . . . may suffice to show that a supervisor 'personally played a role in the alleged

15  constitutional violations.'"  Id. at 1208 (quoting Menotti v. City of Seattle, 409 F.3d 1113, 1149

16  (9th Cir.2005)).

17    To establish his failure-to-train claim, Manzanillo must show that:

18    in light of the duties assigned to specific officers or employees, the
19    need for more or different training [was] obvious, and the
      inadequacy so likely to result in violations of constitutional rights,
20    that the policy-makers . . . can reasonably be said to have been
      deliberately indifferent to the need.

21  Clement v. Gomez, 298 F.3d 898, 905 (9th Cir. 2002) (quoting City of Canton, 489 U.S. at 390).

22    Ordinarily, a single constitutional violation by an untrained employee is insufficient to

23  demonstrate deliberate indifference for purposes of failure to train.  Connick v. Thompson, 563

24  U.S. 51, 62 (2011).  Instead, a plaintiff must usually demonstrate "[a] pattern of similar

25  constitutional violations by untrained employees."  Id.  Defendants argue that a handful of

26  accidental door openings each year, followed by discipline and reprimands, cannot constitute a

27  pattern.  See ECF No. 206 at 17; Connick, 563 U.S. at 62.

28

16

1    In a failure-to-train case, however, a plaintiff need not always prove that there have been

2    repeated violations.  Even in the absence of a prior pattern of constitutional violations, Canton

3    instructs that in some situations the need for training is "so obvious" and "so likely to result in the

4    violation of constitutional rights," that "the failure to provide proper training may fairly be said to

5    represent a policy for which the city is responsible, and for which the city may be held liable if it

6    actually causes injury."  Canton, 489 U.S. at 390.  In the rare case, "a particular showing of

7    obviousness can substitute for the pattern of violations ordinarily necessary to establish municipal

8    culpability."  Wereb v. Maui Cnty., 830 F. Supp. 2d 1026, 1032 (D. Hawaii 2011) (quoting

9    Connick v. Thompson, 563 U.S. 51, 64 (2010)).  If a violation of a protected right is a "highly

10    predictable consequence" of a decision not to train, it is possible to establish a "failure in a . . .

11    training program . . . so obviously deficient that it could lead to liability for damages resulting

12    from a single violation."  Id.  A complete absence of training supports an inference of deliberate

13    indifference.  Connick, 563 U.S. at 67-68 (quoting Canton, 489 U.S. at 391).[9]

14    As previously noted, many witnesses testified that Control Booth Officer on-the-job

15    training is not effective unless the trainee officer observes inmate movement and actually works

16    the control panel to operate the doors in the SHU.  See, e.g., McGuyer Depo. at 4 (testifying that

17    "[i]f you weren't observing inmate movement, then there wasn't a training going on.  You were

18    sitting in a control booth with somebody" and observation of inmate movement is "required");

19    Wood Depo. III at 10 (if "Officer Brown was not shown any prisoner movement during his

20    training block," then "he would not be adequately trained").  Moreover, because the purpose of

21    control booth training is in large part to prevent violence against inmates and staff, a reasonable

22    factfinder could conclude that the violation of an inmate's protected rights would be a "highly

23    predictable consequence" of the prison's decision not to properly train Brown.

24

25    [9]Connick analyzed a claim against a governmental official in his official capacity, yet it is clear

26    that Connick is also applicable to claims against governmental supervisors in their individual
     capacity.  See Flores v. Cnty. of LA, 758 F.3d 1154, 1158-59 (9th Cir. 2014) ("As to an official in

27    his individual capacity, the same standard applies—[a plaintiff] must show that [the defendant
     supervisor] was deliberately indifferent to the need to train subordinates, and the lack of training

28    actually caused the constitutional harm or deprivation of rights.").

United States District Court
Northern District of California

United States District Court
Northern District of California

1          In their testimony, several of the named Defendants seemed to assume that the on-the-job

2     control booth training included observing inmate movement because that observation was such an

3     important part of the job and because inmate movement happened frequently in the SHU, see e.g.,

4     Hallock Depo. at 6-8; McGuyer Depo. at 4; Wood Depo. III, at 10; ECF No. 209 ("Wood Decl.")

5     ¶ 7 ("[A]s SHU Facility-D Captain, it was my expectation and understanding that the two hours of

6     on-the-job training (OJT) that control-booth officers received included . . . observing inmate

7     movement."). Yet Defendants point to no evidence in the record that there are any controls in

8     place such as a check-list, guidelines, or training materials that either require or guarantee that new

9     officers observe inmate movement as part of their training. See, e.g., Wood Depo. at 102 (Q: "Are

10    experienced control booth operators instructed to show new control booth operators inmate

11    movement before they take the post?" . . . A: "It's been a while ago so I'm trying to

12    remember.").[10] While it is clear that Defendants certainly *expected* new officers to observe inmate

13    movement during their two-hour training, Defendants point to no training requirements mandating

14    that expectation be fulfilled.

15          Defendants argue, however, that because Brown's mistake was a single instance unrelated

16    to their training program generally, they had no notice that Brown was improperly trained. ECF

17    No. 225 at 6-7. The evidence does suggest that Defendants learned of Brown's shortcomings only

18    after the attack on Manzanillo, and "they didn't know anything about any of the training that Mr.

19    Brown received or didn't receive." Vasquez Depo. at 4. The problem Manzanillo identifies,

20    however, is not that Brown failed to receive the training ordinarily provided to other Control

21    Booth Officer trainees; but that Defendants' failed to have any standardized instruction or

22    universal curriculum for such trainees, making training failures like Brown's virtually inevitable.

23    On these facts, a factfinder could conclude that Defendants "knew of a substantial risk from the

24    very fact that the risk was obvious." Farmer, 511 U.S. at 842; Love v. Salinas, No. 2:11-cv-

25    00361-MCE-CKD, 2013 WL 4012748, at *7 (E.D. Cal. Aug. 6 2013) ("[E]vidence of a single

26

27    _____

[10]Defendants also fail to point to any evidence that new trainees are required to actually operate
28    the control booth control panel during training, rather than just observing the experienced officer
      do it.

1    violation of an individual's rights can trigger liability if the violation was a 'highly predictable

2    consequence' of the failure to train." (quoting Connick, 563 U.S. at 63-64)).[11]

3            The Court will deny summary judgment as to Defendants Wood, McGuyer, Hallock, and

4    Lewis.

5                                    **b.    Qualified Immunity**

6            Defendants Lewis, Hallock, Wood, and McGuyer also argue that they are entitled to

7    qualified immunity.  As analyzed above, Manzanillo has presented sufficient evidence to establish

8    that Defendants' wrongdoing violated his constitutional rights.  The only remaining question for

9    the Court, therefore, is whether Manzanillo's constitutional right was clearly established.

10           "The state of the law in [2011], when the alleged constitutional violation took place, would

11   have given Defendants a fair warning that their failure to protect Plaintiff from a substantial risk of

12   harm from a known dangerous condition was unconstitutional."  Love v. Salinas, No. 2:11-CV-

13   00361-MCE, 2013 WL 4012748, at *10 (E.D. Cal. Aug. 6, 2013) (citing Estelle v. Gamble, 429

14   U.S. 97, 104–05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); Farmer, 511 U.S. at 837).  It was also

15   established by that time that evidence of a single violation of an individual's rights can trigger

16   liability if the violation was a "highly predictable consequence" of the failure to train.  Connick v.

17   Thompson, 563 U.S. 51, 64

18           Since Manzanillo has presented sufficient evidence to allow a reasonable jury to conclude

19   that the manner of training created a significant risk to his safety and that Defendants knew of the

20   risk but chose to disregard it, Defendants are not entitled to qualified immunity with respect to

21   Manzanillo's "failure to protect" claim on summary judgment.

22   / / /

23   / / /

24   / / /

25   ───────────────

26   [11]Defendants concede that Brown did not observe inmate movement during his training, but argue
     that because Brown had worked for a week without incident, there is no cause to conclude the
27   training was inadequate.  ECF No. 225 at 6-7.  Because there is no evidence that any event
     remotely similar to the one at issue here occurred during that week, it is impossible for the Court
28   to find that a week's on-the-job training was adequate as a matter of law.  Defendants can present
     this theory to the jury.

1

**CONCLUSION**

2          Defendants' motions for summary judgment are denied.

3          IT IS SO ORDERED.

4     Dated:  January 5, 2017

5

6     _____
                                JON S. TIGAR
7                     United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California