UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RAYMOND J. MANZANILLO,

Plaintiff,

v.

GREGORY D. LEWIS, et al.,

Defendants.

Case No. 12-cv-05983-JST

**AMENDED ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**[1]

Re: ECF Nos. 204, 206

Plaintiff Raymond Manzanillo, an inmate at Pelican Bay Prison, was stabbed by another inmate when a guard left his cell door open.  Manzanillo alleges that the guard knew that an attack was likely and that he left the door open in retaliation for Manzanillo having filed a prior lawsuit concerning the prison.

Defendants now move for summary judgment, arguing that (1) Defendant Brown, the guard who left Manzanillo's door open, was not deliberately indifferent to the risk to Manzanillo's safety; (2) the training Brown received was adequate, and that even if it was not, the remaining defendants were unaware of any deficiencies in that training; and (3) in any event, all defendants are entitled to qualified immunity.  ECF No. 204, 206.

For the reasons set forth below, the Court will deny the motions.

**I.     FACTUAL AND PROCEDURAL BACKGROUND**[2]

**A.     Manzanillo's Prior Lawsuit**

During the events giving rise to this lawsuit, Manzanillo was incarcerated at Pelican Bay

---

[1] This order has been amended to correct a few typographical errors.  No substantive changes have been made.

[2] As it must, the Court views the facts in the light most favorable to Manzanillo.  <u>Tolan v. Cotton</u>, 134 S. Ct. 1861, 1866 (2014).

United States District Court
Northern District of California

1    State Prison within the California Department of Corrections and Rehabilitation ("CDCR").

2    Manzanillo was housed in the Security Housing Unit (SHU).[3]  Inmates housed in the SHU have

3    severe disciplinary issues, convictions for assaults committed in prison, or are validated gang

4    members and associates.  ECF No. 212-1 ("Lewis Depo.") at 6-8; ECF No. 212-2 ("McGuyer

5    Depo.") at 3-4; ECF No. 212-8 ("Brown Depo.") at 12; Vasquez Decl. ¶ 15.

6         On August 10, 2010, Brown filed a civil rights action for excessive force against prison

7    officials pursuant to 42 U.S.C. § 1983.  ECF No. 13 at 5; see also ECF No. 213 ¶ 10 ("Manzanillo

8    Decl.").  That action was pending when the events underlying this case occurred.  ECF No. 13 at

9    5.  In his complaint, Manzanillo alleges that Pelican Bay staff permitted him to be assaulted by

10   another inmate in retaliation for filing this lawsuit.  See, e.g., ECF No. 13 at 2 (stating that

11   Defendants "collaborat[ed] in a staging of a gladiator fight that resulted in Plaintiff being attacked

12   and stabbed by another prisoner to retaliate against me for exercising protected conduct").  The

13   presence or absence of such a motive by the guards is not at issue in the present motion.

14   **B.    The Events of August 8, 2011**

15        The events underlying the present case took place on August 8, 2011.  Some time before

16   10:35 a.m. that day, Defendant Naeem Brown, acting as the Control Booth Officer in

17   Manzanillo's pod of cells, let inmate George Blakeley out into the exercise yard.  ECF No. 212-8

18   ("Brown Depo.") at 12.  Blakeley was a member of the "Northern Structure Prison Gang," a

19   "Norteño" affiliated gang, while Manzanillo was an associate of the "Mexican Mafia," or

20   "Sureños" affiliated gang.  Manzanillo Decl. ¶ 13.  "It is common prison knowledge . . . that rival

21   gang inmates in PBSP must be kept separate due to the rioting that occurs in the general

22   population between Northern Hispanics and Southern Hispanics."  Id. at ¶ 15.  At approximately

23   10:35 a.m., while Blakeley was still in the yard, Brown released Manzanillo from his cell so he

24   could speak to a law library officer at the front door of the pod about documents related to his

25   excessive force lawsuit.  Brown Depo. at 12; Manzanillo Decl. ¶¶ 10-12.  While Manzanillo was

26   speaking to the law library officer, Brown allowed Correctional Sergeant B. Grenert, his superior,

27

28
_____
[3] Manzanillo is now an inmate at Kern Valley State Prison.  Manzanillo Decl. ¶ 2.

United States District Court
Northern District of California

United States District Court
Northern District of California

into the control booth and began speaking to him.  Brown Depo. at 12.  Inmate Blakeley, from the yard, was watching "off and on" what was going on inside the pod.  Brown Depo. at 14; see also ECF No. 204-1 at 6. While Brown and Grenert were still speaking, Manzanillo and the law library officer finished their conversation.  Brown Depo. at 12.  Brown saw that Manzanillo turned away from the pod door and made eye contact with him as he was returning to his cell, but admits that he did not maintain constant visual observation of Manzanillo until he was back in his cell with the door secured, a violation of his post orders.  Brown Depo. at 15; Manzanillo Decl. ¶¶ 21-23.  It is undisputed that Manzanillo's "cell door was not electronically secured by control booth officer defendant Brown."  ECF No. 13 at 7.

It seems that while Brown was still conversing with Sergeant Grenert, Blakeley asked to re-enter the pod to return to his cell.[4]  Brown Depo. at 13.  Brown looked into the pod to make sure that no inmates were outside of their cells.  Id.  Brown claims that he then "looked up at the [sic] inmate Manzanillo," but that because Manzanillo's cell "was kind of – it was on the upper tier and it's in the corner," Brown "guess[es] [he] just didn't really notice that his door was open." Id.  When Brown moved to allow Blakeley inside, Manzanillo alleges that he heard the "unit floor officer L. Simonsen state to Brown . . . 'No I don't want you [to].'"  Manzanillo Decl. ¶ 22.

"A couple of seconds later Brown open[ed] the exercise door allowing [Blakeley] out of the yard."  ECF No. 13 at 7; Brown Depo. at 13.  Given what happened next, a reasonable jury could conclude that Blakeley was aware, when he entered the pod, that Manzanillo's door was not closed.  Manzanillo Decl. ¶ 26.  Also, since inmates in the exercise yard "can hear when [cell doors] open and close because it's pretty loud," they are aware when a cell opens and closes and if a cell door is open or closed.  Brown Depo. at 14.  Instead of returning to his own cell, Blakeley "threw something into his cell" and then immediately "ran up the stairs and entered [Manzanillo's] cell to attack [him]" with a homemade 7-inch knife.  Manzanillo Decl. ¶¶ 23-25.  Brown agrees that when he let Blakeley in, he could immediately tell by his actions "something was wrong because he came and he ran straight in and he ran up the stairs."  Brown Depo. at 14.  Brown then

---

[4] There are some slight differences in Brown's various retellings of the events, discussed in further detail below.  See infra at 12.

United States District Court
Northern District of California

"looked up," saw "that the cell door was open," and saw "where [Blakeley] was going."  Id.

Once Blakeley ran inside, Manzanillo "never heard Brown yell out any command for Blakeley to stop his course of action and/or return to his cell," and he never heard Blakeley's cell door being opened as it normally would be upon an inmate's return from the yard.  Manzanillo Decl. ¶ 24.  Brown did not attempt to lock Manzanillo's door before Blakeley arrived there.  Id. ¶ 25.  Instead, when he realized what was happening, he hit his alarm button and made a radio call for backup.  Brown Depo. at 14.  Manzanillo estimates that "cell doors which were only opened half way took less than [three] seconds or so to close," and that it took Blakeley "almost [eight] seconds to trot up the stairs and enter" Manzanillo's cell.  Manzanillo Decl. ¶ 27.[5]  Once Blakeley entered Manzanillo's cell, Brown closed the door to it, locking both inmates inside.  Id.  Manzanillo tried to defend himself for several minutes "before Pelican Bay officials finally entered the unit" and pepper sprayed both Manzanillo and the other prisoner to end the assault.  Id.

Afterwards, Manzanillo was escorted to be decontaminated from the pepper spray.  He alleges that during the escort Defendants Wood and Hallock told him they "had no choice."  Manzanillo Decl. ¶ 30.  Manzanillo was treated for stab wounds and lacerations, and the institution Investigative Services Unit took photographs of his injuries.  ECF No. 13 at 8.  Brown's actions were administratively reviewed and he was disciplined.  See ECF No. 208, Ex. D at 34; McGuyer Depo. at 20; Lewis Depo. at 25-26, 30, 38; Brown Depo. at 56.

On November 26, 2012, Manzanillo filed this case.  ECF No. 1.  The First Amended

---

[5] Defendant Brown makes a variety of objections to Manzanillo's declaration.  ECF No. 224 at 2-5.  For the most part, the objections do not specifically identify the allegedly objectionable testimony.  See, e.g., id. at 2 (stating that "plaintiff cites to hearsay on multiple occasions in his opposition to the motion" without providing a paragraph number).  The Court can only overrule these objections.  Defendant Brown does make a specific hearsay objection on page 3, lines 4-6, and a foundation objection at page 5, lines 2-4.  Both of these objections are also overruled.

The remaining Defendants also make certain objections, ECF No. 225 at 11-12, which do cite to the particular portions of Manzanillo's declaration to which Defendants object.  All of those objections are overruled, except for the speculation objection to Paragraph 21 of Manzanillo's declaration, which is sustained.  The Court notes, however, that Defendant Brown acknowledged in his deposition that there was a light in the control booth that lit up when a cell door was open, so this fact is still in the record.  Brown Depo. at 35-36.  With regard to Defendants' hearsay objections, the Court notes that all of the statements in question have been offered for the fact they were said, and not for the truth of the matter asserted.

1   Complaint was filed on April 26, 2013, alleging, under § 1983, violations of his First Amendment

2   right to be free from retaliation for seeking redress of grievances,[6] his Eighth Amendment right to

3   be free from torture and deliberate indifference to his safety, and his Fourteenth Amendment right

4   to equal protection by Defendants Greg D. Lewis, Kurt McGuyer, Troy A. Wood, John Hallock,

5   and Naeem Brown.  ECF No. 13 at 2, 4.

6          **C.     Jurisdiction**

7          The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.

8   **II.     DISCUSSION**

9          **A.     Legal Standard**

10         Summary judgment is proper where the pleadings, discovery and affidavits show there is

11   "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

12   law."  See Fed. R. Civ. P. 56(a) (2014).  Material facts are those that may affect the outcome of the

13   case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material

14   fact is genuine if the evidence is such that a reasonable jury could return a verdict for the

15   nonmoving party.  See id.

16         A court shall grant summary judgment "against a party who fails to make a showing

17   sufficient to establish the existence of an element essential to that party's case, and on which that

18   party will bear the burden of proof at trial[,] . . . since a complete failure of proof concerning an

19   essential element of the nonmoving party's case necessarily renders all other facts immaterial."

20

21   _____

22   [6] While Manzanillo's complaint alleges a First Amendment retaliation claim, all parties' briefing
     regarding the Defendants' motions for summary judgment is limited to Manzanillo's Eighth
     Amendment deliberate indifference claim.  See ECF No. 13 at 2.  The Court likewise limits its
23   analysis to that claim.  Manzanillo's claim of retaliation is relevant on this motion only to
     Defendants' potential state of mind and motive concerning Plaintiff's deliberate indifference
24   claims.  See Fed. R. Evid. 803(3).

25     On July 27, 2011, Manzanillo attended an annual review meeting and informed Defendant Lewis
     that he had filed an administrative grievance.  ECF No. 13 at ¶ 4. After he "attempted to seek [a]
26   preliminary injunction against Defendant Lewis in the pending lawsuit . . . [Manzanillo alleges]
     Pelican Bay officials retaliated against [Manzanillo] and tortured [him]."  Id. ¶¶ 5-6.  Manzanillo
27   alleges that he was "harassed and threatened verbally, guards spit on his food, [he] was under
     constant surveillance . . . and [he] was tortured by Pelican Bay officials utilizing radio frequency."
28   Id. ¶¶ 3, 6, 7.  Defendants do not engage with these allegations in their motions for summary
     judgment, and Manzanillo makes no claim directly based on them.

United States District Court
Northern District of California

See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  Id.  The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  See id. at 324 (citing Fed. R. Civ. P. 56(e)).

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party.  See Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999).  The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact.  See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

The non-moving party, however, must "identify with reasonable particularity the evidence that precludes summary judgment."  Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996).  Indeed, it is not the duty of the district court "to scour the record in search of a genuine issue of triable fact."  Id.  "A mere scintilla of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some significant probative evidence tending to support the complaint."  Summers v. Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir. 1997) (citation and internal quotation marks omitted).  If the non-moving party fails to make this showing, the moving party is entitled to summary judgment.  Celotex, 477 U.S. at 323.

### B.      Eighth Amendment Safety Claims[7]

---

[7] "[S]tate officials sued in their official capacities are not 'persons' within the meaning of 1983," and damage claims against prison officials in their official capacities are barred by the Eleventh Amendment.  Will v. Michigan Dep't of State Police, 491 U.S. 58, 70 (1989); see also Doe v. Lawrence Livermore Nat'l Lab., 131 F.3d 836, 839 (9th Cir. 1997).  Thus, any claims for money damages brought by Manzanillo against the defendants in their official capacities are barred.  Manzanillo's claims for injunctive and declaratory relief against defendants in their official capacities, however, may proceed.  See Ex Parte Young, 209 U.S. 123 (1908).

United States District Court
Northern District of California

It is well-established that prison officials have a duty to take reasonable steps to protect inmates from physical harm.  See Farmer v. Brennan, 511 U.S. 825, 832-33 (1994).  In particular, prison officials have an affirmative duty to protect inmates from violence at the hands of other inmates.  See id. at 833.  The failure of a prison official to protect inmates from attacks by others from dangerous conditions at the prison only violates the Eighth Amendment, however, when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's safety.  See id. at 834.

In determining whether a deprivation is sufficiently serious to satisfy the objective component of an Eighth Amendment claim, a court must consider the circumstances, nature, and duration of the deprivation.  Id.  With respect to the subjective component in prison conditions cases, a prison official cannot be held liable under the Eighth Amendment for failing to guarantee the safety of a prisoner unless the standard for criminal recklessness is met, i.e., the official must know of and disregard an excessive risk to the inmate's safety.  See id. at 837 (holding deliberate indifference requires that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference").

Deliberate indifference lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other."  Id. at 836.  On the one hand, deliberate indifference describes a more blameworthy state of mind than negligence – negligence, and even gross negligence, are not enough to trigger an Eighth Amendment violation.  See id. at 835.  On the other hand, a plaintiff is not required to show purposeful conduct to meet his burden of showing deliberate indifference.  Id. at 836.

### 1.    Defendant Naeem Brown

Defendant Naeem Brown brings a separate summary judgment motion as to himself.  ECF No. 204.  Manzanillo brings only one cause of action against him, alleging Brown was deliberately indifferent to his safety by not securing Manzanillo's cell door and by allowing

United States District Court
Northern District of California

Blakeley to enter and attack him.  ECF No. 13 at 9, 12.

a.    <b>Brown's Training and Knowledge of Safety Concerns</b>

The first question relevant to Brown's motion is whether he was aware of the risk to Manzanillo's safety posed by an open cell door, which in turn depends, in part, on his training.

As part of that training, Brown received basic instruction on the rules, regulations, policies, and procedures of the California Department of Corrections and Rehabilitation ("CDCR").  Brown Depo. at 4; ECF No. 208 Ex. E ("Hallock Depo.") at 12-14.  He was instructed on prison gangs and rivalries, the risk-classification levels that CDCR assigns to inmates, and inmate-housing settings, including the SHU.  Brown Depo. at 5-9.  After basic training, Brown received a 40-hour block training, which was supposed to include training in how to operate the SHU control booth.  Lewis Depo. at 10; Brown Depo. at 16.  Prior to Brown's first shift in the SHU Unit D-8 control booth, Brown reviewed, understood, and signed Post Order 292349, which describes an officer's responsibilities while working in the control booth.  Lewis Depo. at 11-13; Brown Depo. at 25-29.  Those responsibilities include making a visual check of the pod before opening any door to ensure there are no staff or inmates present, maintaining constant observation of an unescorted inmate when releasing that inmate from his cell to attend various in-house activities, and ensuring that no two doors are open at the same time.  Brown Depo. at 33-35.  Brown also confirmed that he understood that before returning an inmate from the yard, operational procedures required him to "visually inspect the pod and view the control panel to ensure all inmates are secured in their cells."  Brown Depo. at 39.

Brown fully understood that failing to secure Manzanillo's cell door before allowing Blakeley into the pod amounted to a violation of the prison's policies and procedures, as well as his post orders.  Brown Depo. 25-27, 29, 53.  As certain Defendants acknowledge, "[i]t is undisputed that the training instructed officers to constantly observe an inmate until that inmate returns to his cell and the door is secured."  ECF No. 206 at 14.

Brown's on-the-job training, however, did not provide him with an opportunity to practice operating the control booth control panel, and he did not observe inmate movement.  He stated that "it just so happened when I went up there for my two hours . . . everyone was locked up.  So I

8

didn't get to see anything because . . . there was no movement." Brown Depo. at 20. Several of the Defendants, as well as Manzanillo's expert, Daniel Vasquez, have testified that on-the-job training is not effective unless the trainee officer observes inmate movement and actually works the control panel to operate the doors in the SHU. See, e.g., Vasquez Decl. ¶¶ 18-19; McGuyer Depo. at 4-5. For example, Defendant McGuyer opined "[i]f you weren't observing inmate movement, then there wasn't a training going on. You were sitting in a control booth with somebody." McGuyer Depo. at 4. Observation of inmate movement is "required." Id. Defendant Wood concurred that if "Officer Brown was not shown any prisoner movement during his training block," then "he would not be adequately trained." ECF No. 209, Ex. A ("Wood Depo. III") at 10. And Vasquez testified that "For an officer preparing to take the post of Control Booth Operator, training that does not require the officer to observe inmate movement and actually use the control panel to operate the doors is inadequate." Vasquez Decl. ¶ 18.

Before beginning to work in the control booth, Brown understood that the SHU only housed "validated indeterminate gang members and associates." ECF No. 218-1 at 17-18.[8] And he already knew, from his training at the CDCR academy, that "all gangs were rivals." Id. at 4-5. He also learned that rival gang members could attack each other if they interacted. Id. at 8. He also learned, once he got to Pelican Bay, that the inmates housed in the SHU were "some of the worst inmates at the institution and they needed to be segregated from everybody else." Id. at 12. The inmates in the SHU are dangerous, and Brown was aware of that danger on August 8, 2011. Id. at 13.

Moreover, all Defendants were aware that violating operating procedures in the control booth, such as opening cell doors inappropriately, accidentally, or in violation of the operational procedures, often leads to inmate injuries and violence. McGuyer Depo. at 8. SHU operational procedure 222 explains that "staff and inmates will not be in the same proximity with an unrestrained inmate." McGuyer Depo. at 19. The operating rules intended to keep inmates separated while unrestrained are clearly in place due to safety concerns. Id.

---

[8] ECF No. 218-1 contains additional portions of Brown's deposition.

United States District Court
Northern District of California

### b.      Objective Component

A reasonable factfinder, viewing the facts in the light most favorable to Manzanillo, could find that he was subjected to an objectively substantial risk of serious harm when his door remained unsecured while another inmate – a member of a rival gang – was allowed into the pod unescorted.

First, Manzanillo has presented evidence that there are clear policies in place regarding inmate movement that are designed to avoid this precise risk.  See ECF No. 208, Ex. D, ("Wood Depo. II") at 21-23; see also infra at 8.  Manzanillo points to a Post Order issued by the California Department of Corrections and Rehabilitation (CDCR) regarding the duties of a Control Booth Officer at PBSP.  It states, in relevant part: "Under no circumstances should two or more inmates be allowed in the same area at the same time unless they are cellmates or unless both inmates are under the control of staff and are in mechanical restraints."  ECF No. 208-6, Ex. G-2, at 18.  Post Order 292349 also states that "[w]hen releasing an unescorted inmate from his cell to attend various in-house activities (i.e. yard, shower or staff interviews at the pod door), you will maintain constant observation of the inmate until he is restrained by staff or secured into a cell."  ECF No. 208-6, Ex. G-2, at 5.  Defendant Brown signed and indicated that he had read and understood these orders before he began work in the control booth. Brown Depo. at 23.

Moreover, Manzanillo has established that the SHU houses inmates who "pose a definite and serious threat to the safety of others or themselves."  Prison Op. Proc. 222, at 3. The Control Booth Officer supervises and manages the movement of inmates and other correctional officers within that portion of the SHU.  Post Order 292349; Op. Proc. 222, at 13-21. The Control Booth Officer's primary responsibility is to keep inmates separated from others in order to prevent violence.  Vasquez Decl. ¶ 15.

The evidence is undisputed that inmate-on-inmate violence occurs in the SHU, that inadvertent or intentional door openings may lead to such violence, and that the policies described above are in place to prevent violence.  See Wood Depo. II at 21-23; see also infra at 8. Defendant Wood acknowledged in his deposition that, in the SHU, "due to the assaultive nature of the inmates housed there . . . the different gang rivalries and the politics within the different prison

gangs when you let two inmates out unrestrained generally there was going to be a fight."  Wood Depo. II at 21.  Defendant Hallock corroborated that "it is the obligation of the inmates . . . if an officer" opens a door to "fight," and "it happen[s] all the time."  Hallock Depo. at 4-5.  Brown's basic training, as described above, provided him with knowledge of prison gangs and rivalries and the violence that can occur.

The Court finds that Manzanillo has established a triable issue of fact as to whether Brown's failure to close Manzanillo's door before allowing Blakely to enter the pod created "an objectively substantial risk of harm."  <u>Brown v. Lynch</u>, 831 F.3d 1146, 1150 (9th Cir. 2016).

### c.        Subjective Component

Viewing the evidence in the light most favorable to Manzanillo, the Court also concludes that genuine disputes of material fact exist as to whether Brown knew of the substantial risk and disregarded it.

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . ."  <u>Farmer</u>, 511 U.S. at 842.  "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  <u>Id.</u>; <u>see</u> <u>also</u> <u>Berg v. Kincheloe</u>, 794 F.2d 457, 459 (9th Cir. 1986) (holding that the prison official need not "believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before officer is obligated to take steps to prevent such an assault.").  The "obviousness of a risk," however, is not conclusive, and "a prison official may demonstrate that the obvious escaped him."  <u>Farmer</u>, 511 U.S. at 843, n.8.  "If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk."  <u>Gibson v. Cty. of Washoe, Nev.</u>, 290 F.3d 1175, 1188 (9th Cir. 2002).

Defendant Brown states that he had no prior knowledge of the affiliations of Manzanillo or his attacker when the attack occurred, ECF No. 204-2 ("Brown Decl.") ¶ 4; that he did not know that Manzanillo had instituted his prior lawsuit, <u>id.</u>; and that he failed to notice that Manzanillo's door was open when he allowed Blakely back into the pod.  ECF No. 204-1 at 6.  Defendant Brown therefore argues that he was not aware of any specific risk to Manzanillo's safety, and did

1    not disregard any such risk.  Brown Decl. ¶¶ 6-7.

2          Viewing the facts in the light most favorable to Manzanillo, however, a reasonable jury

3    could conclude that Brown was deliberately indifferent to the risk of attack on Manzanillo.  Brown

4    concedes that he did not follow his post orders when he failed to visually observe Manzanillo all

5    the way into his cell.  See Brown Depo. at 83 ("I chose [speaking to a supervisor] over" following

6    procedures as they related to operating doors in the SHU).  Moreover, although Brown disclaims

7    knowing about Manzanillo's prior lawsuit, or realizing that Manzanillo's door was open,

8    Manzanillo has raised triable issues of fact regarding Brown's credibility.  Although Brown claims

9    not to know about Manzanillo's lawsuit, he knew that Manzanillo was talking to the law library

10   officer immediately before Blakely entered the pod.  Brown Depo. at 39.  A jury could find that

11   Brown was aware of the inmates' gang affiliations, which were "common knowledge" in the pod.

12   See Manzanillo Decl. ¶ 14 ("Based on my observations, the gang affiliations of inmates were

13   common knowledge in the Pod. . . . each inmate housed in my Pod was assigned an identification

14   card that indicated each inmate's race and/or gang affiliations.").  And several grounds would

15   permit a jury to disbelieve Brown's initial statement that he was not aware of Manzanillo's open

16   door when he let Blakely in: the contradiction between his initial statement that the open door was

17   difficult to see and his later statement that he noticed the open door when he saw Blakely running

18   into the pod; the undisputed evidence that a light inside the control booth showed when a door was

19   open; Manzanillo's testimony that more than enough time remained to close the door once

20   Blakeley entered the pod, but Brown chose not to do so; that another officer allegedly called out to

21   Brown not to open the door for Blakely in the first place; and that Brown has given different

22   accounts of the events.[9]  See ECF No. 214-1 at 9; Brown Depo. at 162-63; Vasquez Decl. at 19-

23   23; Manzanillo Decl. ¶¶ 21-23.  Taking this evidence in the light most favorable to Manzanillo, he

24   has sufficiently established genuine questions of material fact which must be answered by a jury.

25

26   _____

27   [9] In Brown's incident report to CDCR, he stated that he went to the bathroom without realizing
     Manzanillo's door remained unsecured; in his responses to interrogatories, he stated he was
     "attempting to also secure plaintiff Manzanillo's cell door" while talking to Sergeant Grenert; and

28   at his Skelly hearing and in a deposition he made no mention of a trip to the bathroom or any
     attempt to secure Manzanillo's cell.  ECF No. 215 at 8-9.

United States District Court
Northern District of California

Notably, the Ninth Circuit has reversed a grant of summary judgment in similar circumstances.  In <u>Delgado v. Barnes</u>, 465 Fed. Appx. 712 (9th Cir. 2012), the defendant argued to the district court that his release of the prisoners who attacked the plaintiff was "inadvertent." <u>Delgado v. Barnes</u>, No. C 08-2556 PJH (PR), 2010 WL 3744367, at *3 (N.D. Cal. Sep. 20, 2010). The plaintiff argued that the defendant's "actions were done on purpose."  <u>Id.</u>  The district court held that "[p]laintiff's statements [went] only to his beliefs, not what [the defendant] believed or what his intent was," and therefore plaintiff could not "generate a genuine issue of material fact as to whether the release was inadvertent."  <u>Id.</u> (citing <u>Rodriguez v. Airborne Express</u>, 265 F.3d 890, 902 (9th Cir. 2001)).  Since "the only fact that might generate a genuine issue as to [the defendant's] intent, that he opened the inmates' cell doors at the wrong time, [was] equally probative of intent or inadvertence," the district court granted summary judgment.  <u>Id.</u>  The Ninth Circuit reversed, noting that even in a sparse "he said, she said" situation, summary judgment is "premature" where "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  <u>Delgado</u>, 465 Fed. Appx. at 712 (quoting <u>Farmer</u>, 511 U.S. at 842).

Accordingly, Defendant Brown is not entitled to summary judgment on Manzanillo's Eighth Amendment claim.

### d.        Qualified Immunity

Defendant Brown also argues that summary judgment is warranted because he is entitled to qualified immunity from Manzanillo's Eighth Amendment claim.  The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such right was "clearly established."  <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009).  Where there is no clearly established law that certain conduct constitutes a constitutional violation, a defendant cannot be on notice that such conduct is unlawful.  <u>Rodis v. Cty. of San Francisco</u>, 558 F.3d 964, 970–71 (9th Cir.2009).  The relevant,

1   dispositive inquiry in determining whether a right is clearly established is whether it would be

2   clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  <u>Saucier</u>

3   <u>v. Katz</u>, 533 U.S. 194, 202 (2001).

4        The Court has already determined that a jury could conclude that Defendant Brown's

5   actions violated the Eighth Amendment.  Therefore, the Court now considers whether the right at

6   issue was "clearly established" at the time of the violation.  In a § 1983 action, the plaintiff "bears

7   the burden of proving that the right allegedly violated was clearly established at the time of the

8   official's allegedly impermissible conduct."  <u>Camarillo v. McCarthy</u>, 998 F.2d 638, 640 (9th Cir.

9   1993).  To qualify as a clearly established constitutional right, a plaintiff must show "that every

10  reasonable official would [have understood] that what he is doing violates that right."  <u>Reichle v.</u>

11  <u>Howards</u>, 132 S.Ct. 2088, 2093 (2012) (citation and internal quotation marks omitted).  In other

12  words, "existing precedent must have placed the statutory or constitutional question beyond

13  debate."  <u>Id.</u> (citation and internal quotation marks omitted).

14       By August 2011, it was clearly established in the Ninth Circuit that prison officials violate

15  inmates' constitutional rights when the officials are aware "that placing inmates of different races

16  [or gangs] in [the same place] at the same time presents a serious risk of violent outbreaks," yet

17  allow them to be in the same place together anyway.  <u>Robinson v. Prunty</u>, 249 F.3d 862, 867 (9th

18  Cir. 2001).

19       Brown also contends that he is entitled to qualified immunity because he acted reasonably.

20  ECF No. 204 at 13-14.  Whether a prison official's actions were reasonable is a mixed question of

21  law and fact: "It involves an objective test of whether a reasonable official could have believed

22  that his conduct was lawful in light of what he knew and the action he took.  If there are genuine

23  issues of material fact in issue relating to the historical facts of what the official knew or what he

24  did, it is clear that these are questions of fact for the jury to determine."  <u>Williams</u>, 2012 WL

25  1094351, at *11 (quoting <u>Sinaloa Lake Owners Ass'n v. City of Simi Valley</u>, 70 F.3d 1095, 1099

26  (9th Cir. 1995)).

27       The Court also cannot grant qualified immunity on this ground.  Here, as in <u>Williams</u>,

28  "[w]hen the facts underlying Plaintiff's deliberate indifference to safety . . . claim[] [is] viewed in

United States District Court
Northern District of California

14

the light most favorable to him, a genuine issue of material fact exists as to the reasonableness of Defendant letting [Manzanillo] and [Blakeley] out . . . at the same time . . . in light of [Defendant's] knowledge that it was a violation of prison policy to do so and [Manzanillo] and [Blakelely] were members of different gangs." Id.  A jury could conclude that no reasonable officer knowing what Brown knew – that the SHU housed dangerous inmates who were not to be in the same place at the same time, that prisoners of differing gangs were obligated to fight each other if they could, and that policies in place required constant visual monitoring while they moved about and securing of inmates once they arrived at their destination – would have purposefully violated those policies by being aware of an open door, ignoring it to continue a conversation, and then allowing a rival gang member into the pod, creating a substantial risk of two inmates being together in the same place unrestrained.

In short, Brown's motion for summary judgment on grounds of qualified immunity is denied.

### 2.    Defendants Wood, McGuyer, Lewis, and Hallock

#### a.    Failure To Train

Manzanillo also brings an Eighth Amendment deliberate indifference claim against Defendants Wood, McGuyer, Lewis, and Hallock for their "tacit approval" of and failure-to-train Defendant Brown.  See ECF No. 13.  Defendant Gregory Lewis was the warden of Pelican Bay State Prison during the relevant period and "was responsible for the complete operation of the institution," including hiring and personnel matters.  Lewis Depo. at 3.  Defendant Kurt McGuyer was the associate warden and had administrative responsibility for the daily operations within the SHU.  McGuyer Depo. at 5.  Defendant Troy Wood was the SHU Facility-D Captain for second watch during the relevant period, and managed and oversaw the daily operations of SHU Facility-D from 6:00 a.m. to 2:00 p.m.  Wood Depo. I at 4.  One of Defendant Wood's reported duties was to "[e]nsure that appropriate training is administered to staff on a continuous basis."  Wood Depo. II at 24.  Defendant John Hallock was the SHU Facility-D Sergeant for second watch during the relevant period and supervised the daily operations of SHU Facility-D, maintaining supervision of all staff assigned to that facility from 6:00 a.m. to 2:00 p.m.  Hallock Depo. 11-16.  It is

United States District Court
Northern District of California

1    undisputed that Defendants Wood, McGuyer, Lewis, and Hallock all had responsibility for

2    Defendant Brown's training.

3          The Ninth Circuit has "long permitted plaintiffs to hold supervisors individually liable in

4    § 1983 suits when culpable action, or inaction, is directly attributed to them." Starr v. Baca, 652

5    F.3d 1202, 1205 (9th Cir. 2011), cert. denied, 132 S.Ct. 2101 (2012).  A supervisor may be liable

6    under § 1983 upon a showing of (1) personal involvement in the constitutional deprivation or (2) a

7    sufficient causal connection between the supervisor's wrongful conduct and the constitutional

8    violation.  Redman v. Cty. of San Diego, 942 F.2d 1435, 1446 (9th Cir. 1991) (en banc).

9          Supervisory liability may attach if the requisite causal connection is established "'by

10   setting in motion a series of acts by others,' [or] by 'knowingly refus[ing] to terminate a series of

11   acts by others, which [the supervisor] knew or reasonably should have known would cause others

12   to inflict a constitutional injury.'"  Starr, 652 F.3d at 1207-08 (quoting Dubner v. City & Cty. of

13   San Francisco, 266 F.3d 959, 968 (9th Cir. 2001)).  Officials who are "ultimately in charge of the

14   facility's operations," who know or reasonably should have known about dangerous conditions

15   and acquiesce "'in a deficient policy that was a moving force behind' the harm caused to the

16   plaintiff . . . may suffice to show that a supervisor 'personally played a role in the alleged

17   constitutional violations.'"  Id. at 1208 (quoting Menotti v. City of Seattle, 409 F.3d 1113, 1149

18   (9th Cir.2005)).

19         To establish his failure-to-train claim, Manzanillo must show that:

20               in light of the duties assigned to specific officers or employees, the
                 need for more or different training [was] obvious, and the
21               inadequacy so likely to result in violations of constitutional rights,
                 that the policy-makers . . . can reasonably be said to have been
22               deliberately indifferent to the need.

23   Clement v. Gomez, 298 F.3d 898, 905 (9th Cir. 2002) (quoting City of Canton, 489 U.S. at 390).

24         Ordinarily, a single constitutional violation by an untrained employee is insufficient to

25   demonstrate deliberate indifference for purposes of failure to train.  Connick v. Thompson, 563

26   U.S. 51, 62 (2011).  Instead, a plaintiff must usually demonstrate "[a] pattern of similar

27   constitutional violations by untrained employees."  Id.  Defendants argue that a handful of

28

16

United States District Court
Northern District of California

1    accidental door openings each year, followed by discipline and reprimands, cannot constitute a

2    pattern.  See ECF No. 206 at 17; Connick, 563 U.S. at 62.

3        In a failure-to-train case, however, a plaintiff need not always prove that there have been

4    repeated violations.  Even in the absence of a prior pattern of constitutional violations, Canton

5    instructs that in some situations the need for training is "so obvious" and "so likely to result in the

6    violation of constitutional rights," that "the failure to provide proper training may fairly be said to

7    represent a policy for which the city is responsible, and for which the city may be held liable if it

8    actually causes injury."  Canton, 489 U.S. at 390.  In the rare case, "a particular showing of

9    obviousness can substitute for the pattern of violations ordinarily necessary to establish municipal

10   culpability."  Wereb v. Maui Cty., 830 F. Supp. 2d 1026, 1032 (D. Hawaii 2011) (quoting

11   Connick v. Thompson, 563 U.S. 51, 64 (2010)).  If a violation of a protected right is a "highly

12   predictable consequence" of a decision not to train, it is possible to establish a "failure in a . . .

13   training program . . . so obviously deficient that it could lead to liability for damages resulting

14   from a single violation."  Id.  A complete absence of training supports an inference of deliberate

15   indifference.  Connick, 563 U.S. at 67-68 (quoting Canton, 489 U.S. at 391).[10]

16       As previously noted, many witnesses testified that Control Booth Officer on-the-job

17   training is not effective unless the trainee officer observes inmate movement and actually works

18   the control panel to operate the doors in the SHU.  See, e.g., McGuyer Depo. at 4 (testifying that

19   "[i]f you weren't observing inmate movement, then there wasn't a training going on.  You were

20   sitting in a control booth with somebody" and observation of inmate movement is "required");

21   Wood Depo. III at 10 (if "Officer Brown was not shown any prisoner movement during his

22   training block," then "he would not be adequately trained").  Moreover, because the purpose of

23   control booth training is in large part to prevent violence against inmates and staff, a reasonable

24

25   _____

26   [10] Connick analyzed a claim against a governmental official in his official capacity, yet it is clear
     that Connick is also applicable to claims against governmental supervisors in their individual
     capacity.  See Flores v. Cty. of LA, 758 F.3d 1154, 1158-59 (9th Cir. 2014) ("As to an official in
27   his individual capacity, the same standard applies—[a plaintiff] must show that [the defendant
     supervisor] was deliberately indifferent to the need to train subordinates, and the lack of training
28   actually caused the constitutional harm or deprivation of rights.").

1    factfinder could conclude that the violation of an inmate's protected rights would be a "highly

2    predictable consequence" of the prison's decision not to properly train Brown.

3           In their testimony, several of the named Defendants seemed to assume that the on-the-job

4    control booth training included observing inmate movement because that observation was such an

5    important part of the job and because inmate movement happened frequently in the SHU, see e.g.,

6    Hallock Depo. at 6-8; McGuyer Depo. at 4; Wood Depo. III, at 10; ECF No. 209 ("Wood Decl.")

7    ¶ 7 ("[A]s SHU Facility-D Captain, it was my expectation and understanding that the two hours of

8    on-the-job training (OJT) that control-booth officers received included . . . observing inmate

9    movement.").  Yet Defendants point to no evidence in the record that there are any controls in

10   place such as a check-list, guidelines, or training materials that either require or guarantee that new

11   officers observe inmate movement as part of their training.  See, e.g., Wood Depo. at 102 (Q: "Are

12   experienced control booth operators instructed to show new control booth operators inmate

13   movement before they take the post?" . . . A: "It's been a while ago so I'm trying to

14   remember.").[11]  While it is clear that Defendants certainly *expected* new officers to observe inmate

15   movement during their two-hour training, Defendants point to no training requirements mandating

16   that expectation be fulfilled.

17          Defendants argue, however, that because Brown's mistake was a single instance unrelated

18   to their training program generally, they had no notice that Brown was improperly trained.  ECF

19   No. 225 at 6-7.  The evidence does suggest that Defendants learned of Brown's shortcomings only

20   after the attack on Manzanillo, and "they didn't know anything about any of the training that Mr.

21   Brown received or didn't receive."  Vasquez Depo. at 4.  The problem Manzanillo identifies,

22   however, is not that Brown failed to receive the training ordinarily provided to other Control

23   Booth Officer trainees; but that Defendants' failed to have any standardized instruction or

24   universal curriculum for such trainees, making training failures like Brown's virtually inevitable.

25   On these facts, a factfinder could conclude that Defendants "knew of a substantial risk from the

26

27   ───────────────────────

     [11] Defendants also fail to point to any evidence that new trainees are required to actually operate
28   the control booth control panel during training, rather than just observing the experienced officer
     do it.

                                                      18

very fact that the risk was obvious." Farmer, 511 U.S. at 842; Love v. Salinas, No. 2:11-cv-00361-MCE-CKD, 2013 WL 4012748, at *7 (E.D. Cal. Aug. 6 2013) ("[E]vidence of a single violation of an individual's rights can trigger liability if the violation was a 'highly predictable consequence' of the failure to train." (quoting Connick, 563 U.S. at 63-64)).[12]

The Court will deny summary judgment as to Defendants Wood, McGuyer, Hallock, and Lewis.

### b.      Qualified Immunity

Defendants Lewis, Hallock, Wood, and McGuyer also argue that they are entitled to qualified immunity.  As analyzed above, Manzanillo has presented sufficient evidence to establish that Defendants' wrongdoing violated his constitutional rights.  The only remaining question for the Court, therefore, is whether Manzanillo's constitutional right was clearly established.

"The state of the law in [2011], when the alleged constitutional violation took place, would have given Defendants a fair warning that their failure to protect Plaintiff from a substantial risk of harm from a known dangerous condition was unconstitutional." Love, 2013 WL 4012748, at *10 (citing Estelle v. Gamble, 429 U.S. 97, 104–05 (1976); Farmer, 511 U.S. at 837).  It was also established by that time that evidence of a single violation of an individual's rights can trigger liability if the violation was a "highly predictable consequence" of the failure to train.  Connick, 563 U.S. at 64.

Since Manzanillo has presented sufficient evidence to allow a reasonable jury to conclude that the manner of training created a significant risk to his safety and that Defendants knew of the risk but chose to disregard it, Defendants are not entitled to qualified immunity with respect to Manzanillo's "failure to protect" claim on summary judgment.

### CONCLUSION

Defendants' motions for summary judgment are denied.

---

[12] Defendants concede that Brown did not observe inmate movement during his training, but argue that because Brown had worked for a week without incident, there is no cause to conclude the training was inadequate.  ECF No. 225 at 6-7.  Because there is no evidence that any event remotely similar to the one at issue here occurred during that week, it is impossible for the Court to find that a week's on-the-job training was adequate as a matter of law.  Defendants can present this theory to the jury.

1       IT IS SO ORDERED.

2  Dated:  January 5, 2017

3

4                                 JON S. TIGAR

5                         United States District Judge

United States District Court
Northern District of California